UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHERI CURLER,

                Plaintiff,                    Case No. 2:15-cv-12982
                                          Judge Stephen J. Murphy, III
v.                                     Magistrate Judge Anthony P. Patti

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

## REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DE 16) and GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DE 20)

I.      **RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary

judgment (DE 16), **GRANT** Defendant's motion for summary judgment (DE 20),

and **AFFIRM** the Commissioner's decision.

II.      **REPORT**

      Plaintiff, Sheri Curler, brings this action under 42 U.S.C. § 405(g) and 42

U.S.C. § 1383(c)(3) for review of a final decision of the Commissioner of Social

Security ("Commissioner") denying her application for supplemental security

income (SSI) benefits.  This matter is before the United States Magistrate Judge for

a Report and Recommendation on Plaintiff's motion for summary judgment (DE

16), the Commissioner's cross motion for summary judgment (DE 20), Plaintiff's reply (DE 21), and the administrative record (DE 13).

## A. Background

### 1. First claim for disability benefits

Plaintiff filed her application for SSI benefits on October 19, 2011, alleging that she has been disabled since January 7, 2007, at age 38.  (R. at 228-233.) Plaintiff alleges disability as a result of severe depression, bi-polarism, anxiety, panic attacks and lupus.  (R. at 261.)  Plaintiff's application was denied in March 2012.  (R. at 125-149.)

Two months later, Plaintiff sought a *de novo* hearing before an Administrative Law Judge ("ALJ").  (R. at 152.)  ALJ Elliott Bunce held a hearing on May 10, 2010, at which Plaintiff and vocational expert (VE) Stephanie Leech testified.  (R. at 38-66.)  On June 29, 2010, ALJ Bunce determined that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 104-118.) On August 22, 2011, the Appeals Council denied Plaintiff's request for review. (R. at 119-124.)[1]

### 2. Second claim for disability benefits

---

[1] In Plaintiff's previous case, the appeal to the Sixth Circuit (Appeal Case No. 13-1721) was pending at the time of the June 19, 2013 hearing for the decision currently under review.  *See Curler v. Commissioner of Social Security*, Case No. 2:11-cv-14570-DPH-CEB (E.D. Mich.).

On June 19, 2013, ALJ JoErin O'Leary held a hearing on Plaintiff's second claim for disability benefits, at which Plaintiff, who was represented by counsel, and VE Ann Tremblay testified.  (R. at 67-103.)  On August 8, 2013, ALJ O'Leary determined that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 19-37.)

On October 4, 2013, Plaintiff requested review of the decision.  (R. at 15-18.)  On November 25, 2014, the Appeals Council denied Plaintiff's request for review.  (R. at 6-10.)  Thus, ALJ O'Leary's decision became the Commissioner's final decision.

Plaintiff was granted an extension of time within which to file a civil action.  (R. at 1-5.)  Plaintiff then timely commenced the instant action on August 21, 2015.  (DE 1.)

**B.    Plaintiff's Medical History**

Plaintiff alleges in her initial field office disability report that she has been disabled since January 7, 2007.  (*See* R. at 246.)  Her medical records span the period from September 18, 2007 to June 12, 2013.  (R. at 363-556 [Exhibits 1F-18F].)  The 194 pages of medical records – comprised of both physical and mental health records - will be discussed as necessary below.

## C.     The Administrative Decision[2]

ALJ O'Leary rendered her decision on August 8, 2013.  At **Step 1**, she

determined that Plaintiff has not engaged in substantial gainful activity since

September 16, 2011, the application date.  (R. at 24.)  At **Step 2**, the ALJ

determined that Plaintiff has the severe impairments of lupus, degenerative disc

disease (DDD), thyroid disorder, migraines, obesity, depression and anxiety.  (R. at

24.)  At **Step 3**, the ALJ determined that Plaintiff does not have an impairment or

combination of impairments that meets or medically equals the severity of one of

the listed impairments.  (R. at 24-26.)  At **Step 4**, the ALJ determined that Plaintiff

had the RFC to perform the *exertional* limitations of sedentary work, except that

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4); see also 20 C.F.R. § 416.920.  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

    1.     Is the claimant engaged in substantial gainful activity?
    2.     Does the claimant suffer from one or more severe impairments?
    3.     Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
    4.     Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
    5.     Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

4

she needs to use a cane, with certain other *postural* (can never climb ladders or scaffolds and kneel or crawl), *environmental* (must avoid unprotected heights or dangerous moving mechanical parts) and *mental health* (is limited to simple, routine, repetitive tasks not performed at a production-rate pace) limitations, and further found that Plaintiff has no past relevant work.  (R. at 26-30.)  At **Step 5**, considering Plaintiff's age, education, work experience, and RFC, the ALJ found that there are jobs that exist in significant numbers in the national economy that the Plaintiff can perform.  (R. at 30-31.)

### D.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241

(quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## E.     Discussion

Plaintiff argues that the ALJ improperly: (1) assigned "little weight" to the opinions of Plaintiff's treating psychiatrist, Michael Ingram, M.D.; (2) assigned "some weight" to the consultative examination report of Sally J. Glowicki, M.A. and Ann L. Date, Psy.D; and (3) evaluated her subjective complaints with respect to her systemic lupus erythematosus (SLE) by inaccurately interpreting the findings in Plaintiff's treatment records. (DE 16 at 7-24; *see also* DE 21.) The Commissioner argues for affirmance, asserting that: (1) the ALJ properly weighed the opinions of Ingram, Glowicki and Date; and, (2) appropriately assessed Plaintiff's credibility. (DE 20 at 7-21.)

### 1.    Opinion evidence as to Plaintiff's mental health limitations

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. §§ 404.1527(b), 416.927(b). The regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). "Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists." 20 CFR §§ 404.1527(e)(2)(i), 416.927(e)(2)(i). The ALJ must,

however, "consider findings and other opinions" of State Agency medical or psychological consultants.

### a.  The ALJ's various assignments of weight

The ALJ determined that Plaintiff's RFC included the mental health limitations of simple, routine, repetitive tasks not performed at a production-rate pace.  (R. at 27.)  Plaintiff seems to dispute this finding, arguing that the ALJ should have given:  (i) more weight to the opinions from her treating psychiatrist, Dr. Ingram; and, (ii) no weight to the opinion from Glowicki and Dr. Date - points which the Commissioner disputes.  (DE 16 at 7-18, DE 21 at 1-5; DE 20 at 7-17.) For the reasons that follow, the Court should conclude that the ALJ properly weighed the opinion evidence regarding Plaintiff's mental health limitations.

### b.  The April 5, 2013 opinion of Michael Ingram, M.D. (treating psychiatrist)

"Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques."  SSR 96-2P (S.S.A. July 2, 1996).  "Even if a treating source's medical opinion is well- supported, controlling weight may not be given to the opinion unless it also is 'not inconsistent' with the other substantial evidence in the case record."  *Id*.  "The judgment whether a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and

8

laboratory findings and what they signify." *Id.* "If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; *i.e.*, it must be adopted." *Id.*

Plaintiff's treatment relationship with Dr. Ingram appears to have been initiated in 2007 with a comprehensive psychiatric assessment.  (R. at 366-369 [Ex. 1F]; *see also* R. at 483-486 [Ex. 11F].)  Plaintiff received treatment from the same office in March / February 2008, December 2009, and February 2010.  (R. at 471-482 [Ex. 11F].)  On March 31, 2010, Dr. Ingram completed a medication review, in addition to what amounts to a mental RFC form, and his office performed another medication review in April / May 2010.  (R. at 468-470 [Ex. 11F], R. at 409-411 [Ex. 5F]).

Plaintiff's treatment with Dr. Ingram and/or his office continued following ALJ Bunce's June 29, 2010 decision.  (R. at 104-118.)  Plaintiff's medical records are replete with office treatment records from Dr. Ingram, which span the period from August 10, 2010 through June 12, 2013.  (*See*, *i.e.*, R. at 460-467, 487-491 [Ex. 11F]), 519-541 [Ex. 15F], 555-556 [Ex. 18F]).  The ALJ expressly cited to each of these exhibits during his Step 4 RFC determination:

> In **June 2011** she complained of "mild" anxiety, "mild" depression, and "I am okay a little melancholy" to her psychiatrist, Michael Ingram, M.D., who found her oriented, attentive, cooperative, and normal speech/thought process with medication prescribed (11F/31 [R. at 490]).  She reported

9

worsened symptoms in **August 2011** but return [sic] to occasional anxiety and mild depression in **November 2011** (11F/3, 28 [R. at 462, 487]). Dr. Ingram noted her report of family issues, financial issues of not working, and she was back to school, in **March 2012** (11F/1 [R. at 460]). Dr. Ingram found in **July 2012** that the claimant was attentive, cooperative, oriented, and [m]ood "I feel pretty good" with appropriate affect and otherwise normal mental status (15F/3 [R. at 521]). In **January 2013**, she reported taking less medication because she "feels better on the lower dose" and denied depression symptoms with "much improved" concentration and unremarkable mental status examination (15F/12 [R. at 530]). The claimant reported in **June 2013** having difficulty focusing being back in school and complaints of family/financial stress to Dr. Ingram, who increased her medication (18F [R. at 555-556]).

(R. at 28-29 (emphases added).)

In her consideration of the opinion evidence, the ALJ specifically addressed both Dr. Ingram's March 31, 2010 and April 5, 2013 assessments of ability to do mental work-related activities. (R. at 30, 409-411 [Ex. 5F], R. at 493-495 [Ex. 12F]). (R. at 30.) In particular, I note that Dr. Ingram's April 5, 2013 assessment concluded, among other things, that Plaintiff had no limitations in activities of daily living, marked limitations in maintaining social functioning, extreme limitations in maintaining CPP, and four or more episodes of decompensation each of extended duration; in addition, it seems that he assessed Plaintiff's Global Assessment of Functioning (GAF) score as 45. (R. at 494.) ALJ O'Leary concluded that this opinion was "not supported or consistent with the medical evidence[,]" noting that Plaintiff's "conditions are described as stable and

responsive to treatment."  As such, the ALJ gave this "unreasonably restrictive assessment little weight."  (R. at 30.)

20 C.F.R. §§ 404.1527(c), 416.927(c), which concern how the SSA weighs medical opinions, lists several factors to be considered where, as here, the treating source's opinion is not given controlling weight.  Plaintiff contends that the "treatment relationship" and "specialization" factors, 20 C.F.R. §§ 404.1527(c)(2),(5) & 416.927(c)(2),(5), weigh in favor of adopting Dr. Ingram's opinion(s).  (DE 16 at 8.)  This may be so, as it appears she received *mental health* treatment from *psychiatrist* Dr. Ingram or his office on *several occasions* from 2007 - 2013.  (*See*, *i.e.*, R. at 460-491 [Ex. 11F], R. at 519-541 [Ex. 15F], R. at 555-556 [Ex. 18F])).

Nonetheless, the ALJ discounted Dr. Ingram's April 5, 2013 opinion (R. at 493-495 [Ex. 12F]; *see also* R. at 536 [Ex. 15F]) on the supportability and consistency factors.  (*See* R. at 30, 20 C.F.R. §§ 404.1527(c)(3),(4) & 416.927(c)(3),(4).)  Plaintiff alleges that the ALJ's decision as to these factors is based on an "incomplete summary" of Dr. Ingram's treatment records, which flies afoul of the requirement that the ALJ's decision "must contain specific reasons for the weight given to the treating source's medical opinion, *supported by the evidence in the case record*, and must be *sufficiently specific* to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's

medical opinion and the reasons for that weight." SSR 96-2p (emphases added). (*See* DE 16 at 9.) In other words, Plaintiff alleges that the ALJ's decision "is based on a cursory review of only a portion of Dr. Ingram's treatment records . . . and is not supported by substantial evidence of record[,]" pointing out several of Dr. Ingram's records which she believes the ALJ did not address. (DE 16 at 10-14; *see also* DE 21 at 4.)

Plaintiff further argues that the ALJ's highlighted citations to the record do not account for Dr. Ingram's treatment record, which "details fluctuations in Plaintiff's symptoms while noting signs and symptoms which fully support his opinion . . ." (DE 16 at 15-16.) For example, Plaintiff points out that, on March 2, 2012, she reported to Dr. Ingram that "her Lupus is flaring up," she has "symptoms of nervousness, restlessness and an inability to relax[,]" and "depressed mood." Plaintiff was prescribed Lexapro and Vistaril and was diagnosed with "severe major depression, recurrent episode." (R. at 460, DE 16 at 14-15.) Plaintiff also points out that, at the July 6, 2012 visit with Dr. Ingram, she reported "anxiety related issues," "symptoms of nervousness, restlessness and an inability to relax," as well as "symptoms of depression," such as "depressed mood." (R. at 521-524, DE 16 at 15.) Plaintiff also points out that Dr. Ingram's June 12, 2013 medication review revealed that Plaintiff's current medications included Ritalin, Vistaril and Cymbalta, and her diagnosis was "severe major depression, recurrent episode." (R.

at 555-556, DE 16 at 15.)  Accordingly, Plaintiff contends that the ALJ "focused on instances when Plaintiff felt 'better' or 'improved[,]'" (DE 16 at 15), in essence, "cherry-picking" the record.

Still, the Court should conclude that the ALJ properly discounted the April 5, 2013 opinion of Dr. Ingram on the bases of supportability and consistency.  (R. at 30, 493-495, 20 C.F.R. §§ 404.1527(c)(3),(4), 416.927(c)(3),(4).)  First, as set forth above, the ALJ expressly considered several of Dr. Ingram's records from the two-year period beginning June 2011 and ending June 2013.  (R. at 28-29.)  To the extent Plaintiff claims the ALJ relied upon an "incomplete summary" or omitted reference to "over two-thirds" of Dr. Ingram's records (*see* DE 16 at 9), the argument that the ALJ mischaracterized or "cherry-picked" the record is frequently made and seldom successful, because "the same process can be described more neutrally as weighing the evidence."  *White v. Commissioner,* 572 F.3d 272, 284 (6th Cir.2009).  The narrow scope of judicial review of the Commissioner's final administrative decision does not include re-weighing evidence, deciding questions of credibility, or substituting the court's judgment for that of the ALJ.  *See Ulman v. Commissioner,* 693 F.3d 709, 713 (6th Cir.2012); *Bass v. McMahon,* 499 F.3d

13

506, 509 (6th Cir.2007).[3]  In fact, the ALJ expressly noted that her decision was
based upon "careful consideration of the entire record[.]"  (R. at 24, 26.)

Second, and more to the point, the ALJ's statement that Plaintiff's
conditions are "responsive to treatment" is supported by the acknowledgement of
Dr. Ingram's June 15, 2011 prescription of 1 Lexapro 20 mg tablet each day (R. at
490-491), Plaintiff's January 29, 2013 report to Dr. Ingram that "she has only been
taking Lexapro 20 mg daily instead of 40 mg and feels better on the lower dose,
denies any s/s of depression[,]"[4] and "[r]eports her focus and concentration is much
improved on the Ritalin . . . ."  (R. at 530), and Dr. Ingram's June 12, 2013 notes

---

[3] Here, it is worth noting that Plaintiff's claims that the ALJ "misstated" or
"misinterpreted" the record are contained within her credibility argument as to her
physical conditions.  (*See* DE 16 at 18, 21, 24.)

[4] Plaintiff has been prescribed Lexapro on and off over the years.  For example, on
September 18, 2007, Plaintiff informed Dr. Ingram that Lexapro "did not work,"
and he prescribed Zoloft.  (R. at 486.)  More than two years later, Dr. Ingram's
notes dated December 9, 2009, reflect that Plaintiff was taking 20 mg of Lexapro.
(R. at 473.)  On March 31, 2010, Dr. Ingram held the Lexapro and continued
Wellbutrin.  (R. at 470.)  Dr. Ingram thereafter prescribed 20 mg Lexapro per day
on August 10, 2010 (R. at 466), March 7, 2011 (R. at 464), June 15, 2011 (R. at
489-491), August 9, 2011 (R. at 487-488), November 2, 2011 (R. at 462-463), and
March 2, 2012 (R. at 460-461).  On July 6, 2012, Dr. Ingram noted that Plaintiff
was taking 40 mg of Lexapro per day and continued her on that dose (R. at 521-
524; *see also* R. at 525-527).  Then, by March 26, 2013, Dr. Ingram was tapering
Plaintiff off the Lexapro.  (R. at 532-535; *see also* R. at 537-539.)  On April 5,
2013, Dr. Ingram noted a need to change Plaintiff's antidepressants.  (R. at 536.)
By the time of Plaintiff's June 12, 2013 medication review, Lexapro was not listed
as a current medication, although Ritalin, Vistaril, and Cymbalta were listed.  (R.
at 555-556.)

about difficulty focusing in college, reports of family / financial stress, and an apparent increase in her Ritalin prescription (R. at 555-556).[5]   (R. at 29-30.)

Third, while not expressly explained as such by the ALJ, her statement that Plaintiff's conditions are "described as stable," (R. at 30) has support in the record, as:  **(a)** Dr. Ingram's March 31, 2010 and April 5, 2013 assessments that Plaintiff had marked limitations in her ability to behave in an emotionally stable manner (R. at 410, 494)[6] seem to contradict Dr. Ingram's August 10, 2010 medication review notes that Plaintiff's mood "seems to be stable and she minimized any depressive symptoms[,]" (R. at 466); and, **(b)** notes from an April 30, 2010 medication review indicate that Plaintiff is "stable.  She reports sporadic, mild, moderate or severe depression.  She reports mild to moderate depression today.  She denies any suicidal or homicidal ideation."  (R. at 468-469 [Ex. 11F].)

---

[5] Dr. Ingram prescribed 20 mg Ritalin total per day on November 29, 2012, January 29, 2013, March 26, 2013 and April 24, 2013.  (R. at 528-539.)  The increase attributable to Dr. Ingram's June 12, 2013 prescription for Ritalin appears to be 30 mg total per day (10 mg tablets - 1.5 tablets, 2x each day).  (R. at 555-556.)

[6] Plaintiff notes that the ALJ did not specifically address Dr. Ingram's March 31, 2010 assessment (R. at 409-411 [Ex. 5F], DE 16 at 17-18); however, an ALJ is not required to specifically mention each and every medical record in her opinion, so long as it is clear that the entire record was considered.  *Tracy v. Comm'r of Soc. Sec.*, No. 1:12CV588, 2013 WL 3287113, at *7 (S.D. Ohio June 28, 2013) ("The ALJ need not cite to every single medical record, when it is clear that all relevant records have been considered.").  It is clear in the instant matter.

Fourth, Dr. Ingram noted at least twice in 2011 that Plaintiff described her depressive symptoms as "mild," and the ALJ expressly acknowledged as much. (R. at 28-29, 490-491, 462-463; *see also* DE 20 at 14-15.)  Likewise, I note multiple instances from June 15, 2011 through April 24, 2013 where Dr. Ingram or someone else from his office noted "major depressive disorder (recurrent mild)" and/or "severe major depression, recurrent episode" as her diagnoses.  (*See*, *i.e.*, R. at 461, 463, 488, 491 [Ex. 11F], R. at 520, 522, 526, 529, 531, 534, 539 [Ex. 15F]).

Thus, the ALJ was well within her authority to weigh Dr. Ingram's opinion as she did, and she was not required to assign it controlling weight.  It is not for this Court to reweigh this evidence in Plaintiff's favor.

### c.   The January 15, 2008 opinion of Glowicki and Date (consultative mental health examiners)

At Step 4, the ALJ referred to several observations from the January 15, 2008 consultative examination report of Glowicki and Date, such as "gave good eye contact," "was friendly and cooperative," "demonstrated good insight and judgment," "self[-]esteem appeared low," "speech was logical, organized and relevant[,]" "affect appeared constricted[,]" "described her mood as 'pretty depressed[,]'" and "was oriented to person, place and date."  (R. at 28, R. at 370-376 [Ex. 2F].)  Then, the ALJ stated that their diagnosis of mood disorder with a global assessment of functioning (GAF) score of 52 and a fair prognosis reflected Plaintiff's "ability to engage in sustained mental work-related activities[,]" and was

16

"supported by medically acceptable clinical techniques and consistent with the other substantial evidence."  However, noting that the opinion was more than five years old, the ALJ gave it "only some weight."  (R. at 29-30, 375-376.)

Plaintiff contends that the ALJ erred in giving any weight to this opinion, as it predates the June 29, 2010 decision by ALJ Bunce.  (DE 16 at 16-18; *see also* DE 21 at 4-5.)  In other words, seemingly given the ALJ's statement that "I can only consider the claimant's application for [SSI] Benefits as of the day after the prior decision," Plaintiff contends that "the current Decision was restricted to considering Plaintiff's application as of June 30, 2010."  (R. at 22, DE 16 at 16.)  Plaintiff further contends that, as consultative examiners, Glowicki and Date do not have the "treatment relationship" factors in their favor.  (DE 16 at 17, 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)).  Also, Plaintiff contends that, with specialties in mental health, these examiners would not be considered experts when opining that "there was insufficient evidence to substantiate a pain disorder . . . ."  (DE 16 at 17, R. at 375, 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5).)

However, the Court should conclude that the ALJ did not err in her treatment of this opinion.  As noted above, in giving it "only some weight," she expressly noted that the opinion was more than five years old.  (R. at 29-30, 375-376.)  Also, the ALJ expressly relied upon it only in her assessment of Plaintiff's *mental health issues*.  (R. at 28, 29-30, 373-376.)  Additionally, Plaintiff's reliance

17

upon *Cottrell v. Sullivan*, 987 F.2d 342, 344 (6th Cir. 1992), which stated that *a claim of disability prior to a certain date* was "barred by the doctrine of *res judicata[,]*" is distinguishable, as the issue here is the express *consideration of a particular piece of evidence* dated 2008 in both ALJ Bunce's June 29, 2010 decision and ALJ O'Leary's August 8, 2013 decision.  (*See* R at 28, 29-30, 110; DE 21 at 5.)  Furthermore, as pointed out by the Commissioner and as noted below, the ALJ's Step 4 RFC determination is supported by the 2012 mental RFC assessment of state agency psychological consultant, Joe DeLoach, Ph.D., consistent with SSR 96-6p, 20 C.F.R. §§ 404.1527(e), 416.927(e), and substantial evidence of record.  (DE 20 at 16, R. at 136-137.)  Finally, as the Commissioner states, "[w]hile the ALJ was not required to evaluate the consultative assessment where it fell outside the adjudicated period, Plaintiff has not shown any error in considering it[.]"  (DE 20 at 16.)  The ALJ was certainly permitted to consider the consistency of evaluations over a multi-year period.

### d.     The March 28, 2012 opinion of Joe DeLoach, Ph.D. (state agency reviewing psychiatrist)

On March 28, 2012, state agency reviewing psychiatrist Joe DeLoach, Ph.D., determined that Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace (CPP).  (R. at 132.)  In addition, as to Plaintiff's mental RFC, Dr. DeLoach opined that Plaintiff was moderately

18

limited with respect to her abilities to:  carry out detailed instructions, maintain

attention and concentration for extended periods, complete a normal workday and

workweek without interruptions from psychologically based symptoms, and

perform at a consistent pace without an unreasonable number and length of rest

periods.  (R. at 136.)

"[A]dministrative law judges must consider findings and other opinions of

State agency medical and psychological consultants and other program physicians,

psychologists, and other medical specialists as opinion evidence, except for the

ultimate determination about whether you are disabled[.]"  20 C.F.R. §§

404.1527(e)(2)(i).  The Social Security Ruling (SSR) which comments upon

"consideration of administrative findings of fact by state agency medical and

psychological consultants" provides, in part:

> . . . the opinions of State agency medical and psychological
> consultants and other program physicians and psychologists can be
> given weight only insofar as they are *supported by evidence in the
> case record*, considering such factors as the *supportability of the
> opinion in the evidence* including any evidence received at the
> administrative law judge and Appeals Council levels that was not
> before the State agency, the *consistency of the opinion with the record
> as a whole*, including other medical opinions, and any explanation for
> the opinion provided by the State agency medical or psychological
> consultant or other program physician or psychologist. The
> adjudicator must also consider all other factors that could have a
> bearing on the weight to which an opinion is entitled, including any
> *specialization* of the State agency medical or psychological
> consultant.

SSR 96-6P (S.S.A. July 2, 1996) (emphasis added).  Moreover, the regulations

provide for consideration of opinions by *non-examining* sources, sometimes with

greater weight than was given to a treating source:

> In appropriate circumstances, opinions from State agency medical and
> psychological consultants and other program physicians and
> psychologists may be entitled to greater weight than the opinions of
> treating or examining sources.  For example, the opinion of a State
> agency medical or psychological consultant or other program
> physician or psychologist may be entitled to greater weight than a
> treating source s medical opinion if the State agency medical or
> p[s]ychological consultant's opinion is based on a review of a
> complete case record that includes a medical report from a specialist
> in the individual's particular impairment which provides more detailed
> and comprehensive information than what was available to the
> individual's treating source.

*Id*.; *see also* 20 C.F.R. §§ 404.1527(e), 416.927(e).

With express consideration of Dr. DeLoach's statement that Plaintiff

"should be limited to simple tasks, working alone or in a small group[,]" the ALJ

assigned this opinion "great weight," on the basis that the evidence "did not

provide anything that would change the [RFC]."  (R. at 29, 137.)  Thus, the ALJ

considered this opinion as consistent with the evidence of record and its resulting

RFC.[7]

---

[7] I also note that, within the assessment of Plaintiff's credibility, the ALJ observed
that Plaintiff's "treatment was limited and relatively successful in terms of her
mental health issues (llF/31 [R. at 490], l5F/3, 12 [R. at 521, 530]).  She testified
that she had counseling but no hospitalizations [*see* R. at 47-48; *see also* R. at 371]
. . . ."  (R. at 29.)

### e.  Conclusion

As to Plaintiff's mental health limitations, the ALJ permissibly gave greater weight to the opinions of state agency, non-treating consultants Dr. DeLoach, MA Glowicki and Dr. Date, while at the same time giving less weight to the opinion of Plaintiff's treating physician, Dr. Ingram.  (R. at 29-30.)  Here, the ALJ provided good reasons for the relative assignments of weight to the opinion evidence, specifically referencing some of the factors contemplated by 20 C.F.R. §§ 404.1527, 416.927, such as supportability and consistency.  20 C.F.R. §§ 404.1527(c)(3),(4), 416.927(c)(3),(4).[8]  Because of this, the Court is able to conduct a "meaningful review," as contemplated by *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Therefore, the Court should conclude that the ALJ's assignment of weight to the mental health opinion evidence in this case does not warrant remand.

### 2.  Plaintiff's credibility as to her subjective complaints related to systemic lupus erythematosus (SLE) and degenerative disc disease (DDD)

#### a.  The ALJ's consideration of Plaintiff's SLE

At Step 2, the ALJ determined that lupus is among Plaintiff's severe impairments.  (R. at 24.)  At Step 3, the ALJ determined that Plaintiff's lupus does

---

[8] Although these are factors applied to treating sources – and Glowicki, Date and DeLoach were indisputably not treating sources, but, rather, consultative examiners or state consultants – the application of this framework is logical and by no means inappropriate here.

not meet or medically equal the criteria of Listing 14.02 ("Systemic lupus erythematosus"). (R. at 25.) At Step 4, the ALJ considered Plaintiff's testimony that she has lupus. (R. at 27; *see also* R. at 72-75, 84, 88-89, 91, 96.) The ALJ also made the following observations about Plaintiff's lupus:

- In terms of the claimant's Lupus, neurologist, Steven Beall, M.D., found in March 2008 mild left knee weakness diagnosed as myelopathic monoparesis (3F/5 [R. at 381]).

- [An April 2008 magnetic resonance angiography (MRA) of the brain] showed no aneurysm and a . . . May 2008 [MS protocol] showed white matter but no multiple sclerosis (MS) (3F/l7-20 [R. at 393-396]).

- In September 2008, Dr. Beall saw the claimant for the second time and had no new findings with brain MRI that "barely satisfy the dissemination in space criteria for MS (3F/6, 21 [R. at 382, 397])."

- Dr. Beall noted in October 2008 "myelopathic monoparesis has gotten significantly better (3F/8 [R. at 385])."

- Dr. Beall noted in the next month's [November 2008] progress visit "even further resolved" [myelopathic quadriparesis] and [a November *2009*] brain MRI showed multiple foci of nonenhancing abnormal signal (3F/10, 26 [R. at 387, 402]).

- In March 2009, Dr. Beall noted [Plaintiff's] report of a little bit of finger numbness and found "complete resolution of her myelopathic quadriparesis" that remained resolved [at the] August 2009 progress visit (3F/14-16 [R. at 390-392]).

- The claimant had spinal fluid testing that neurologist, Sanjeev Prakash, M.D., diagnosed as [SLE], in February 2010, and provided treatment (4F [R. at 404-406], 6F [R. at 416]).

- Dr. Beall provided treatment and in May 2011 found joint weakness but [found] "coordination normal in all extremities" and [noted that] "sensory examination shows vibration normal in all extremities (7F/l [R. at 436])."

- In December 2011, neurologist, Thomas Giancarlo, D.O., noted [Plaintiff's] report [that] "she feels her lupus is controlled" and had fatigue but unremarkable brain MRI (8F [R. at 446, 448]).

- The claimant reported to her treating physician, Praveen Kamaraju, M.D., that she had lightheadedness, in March 2012 (14F/6 [R. at 509]).

- Dr. Prakash noted her report of "some" fatigue and not a lot of pain, in July 2012, and described her pain as "generalized muscle pain," in March 2013 (13F/2-3 [R. at 497-498]).

- Her Tilt-table test results in April 2013 [were] negative (14F/14 [R. at 517]).

(R. at 27-28.)

### b.   The ALJ's consideration of Plaintiff's DDD

At Step 2, the ALJ concluded that Plaintiff's severe impairments included DDD.  (R. at 24.)  At Step 3, the ALJ found that, while the medical evidence establishes DDD, "the evidence does not satisfy the criteria of section 1.04 (Disorders of the spine) . . . ."  (R. at 25.)  Then, at Step 4, with respect to Plaintiff's back pain, the ALJ noted:

- . . . cervical spine MRI in May 2008 showed stenosis and herniated nucleus pulposus (3F/18 [R. at 395]).

- MRI in September 2008 showed bulging, herniation, and mild cord compression (3F/23 [R. at 399-400]).

- She was prescribed exercises for her complaint of back pain in February 2010 by neurologist, Sanjeev Prakash, M.D., who noted in June 2011 that she did not do them (6F/l-3 [R. at 414, 416]).

- Cervical spine MRI in December 2011 showed osteophyte causing "minimal" cord deformity (8F [R. at 447]).

- [In February 2012,] [t]he claimant's treating physician, Praveen Kamaraju, M.D., noted her low back pain with generalized weakness but had unremarkable findings . . . (14F/3 [R. at 506-508]).

(R. at 28.)

### c. The ALJ's consideration of state agency medical consultant Sarah Bankcroft-Treadway, M.D.'s physical RFC assessment

In her Step 4 consideration of the opinion evidence, the ALJ considered state agency medical consultant Sarah Bancroft-Treadway, M.D.'s March 2012 physical RFC assessment, which assessed exertional limitations consistent with light work, and postural limitations of occasional stooping but never climbing, balancing, kneeling, crouching or crawling.  (R. at 29, 134-135; *see also* R. at 138, 20 C.F.R. §§ 404.1567(b), 416.967(b).)  Each of these limitations was assessed "due to DDD, obesity, and SLE."  (R. at 135.)

The ALJ gave this opinion "some weight," explaining that it was "accounted for . . . in the [RFC][,]" and noting that "[t]he overall finding of not disabled is consistent with the medical evidence described above."  (R. at 29.)  In addition,

24

after acknowledging the expertise of state agency consultants, the ALJ stated:

"Their assessment that the claimant retained the capacity to perform *light unskilled*

*work* with some postural limitations was supported by the objective medical

evidence of record."  (R. at 30 (emphasis added).)  This is noteworthy, because

*sedentary work* involves "lifting no more than 10 pounds at a time and

occasionally lifting or carrying articles like docket files, ledgers, and small

tools[,]" and "sitting, a certain amount of walking and standing is often necessary

in carrying out job duties."  20 C.F.R. §§ 404.1567(a), 416.927(a).  Thus, it is

consistent with Plaintiff's May 10, 2010 testimony that she could maybe lift "five

to ten pounds[,]" her December 2011 representation that she can lift "10 pounds or

under[,]" or Plaintiff's mother's December 2011 representation that Plaintiff can

lift 10 pounds.  (*See* R. at 27, 30, 50, 277, 285.)[9]

> **d.**    **The ALJ's credibility determination as to Plaintiff's SLE and DDD severe impairments**

Plaintiff challenges the ALJ's credibility determination with respect to her

SLE and DDD.  (DE 16 at 18-24.)  The ALJ's "assessment of credibility is entitled

to great weight and deference, since he [or she] had the opportunity to observe the

---

[9] I do note that the ALJ's Step 4 RFC determination omits express mention of Dr. Treadway's postural limitations of never climbing ramps, stairs or ropes; never balancing; only occasionally stooping; and never crouching.  (*Compare* R. at 26-27, 135.)  However, to the extent Plaintiff's motion takes issue with the failure of the RFC to include limitations for bending or crouching (DE 16 at 22), it is part and parcel of her credibility argument, not a separate challenge to the RFC finding.

witness's demeanor." *Infantado v. Astrue,* 263 F. App'x 469, 475 (6th Cir. 2008).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility

of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247.  It is for this

reason that the ALJ's credibility findings have at times been characterized as

"unchallengeable." *Payne v. Comm'r Soc. Sec.,* 402 F. App'x 109, 113-114 (6th

Cir. 2010); *see, Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001)

("A circuit court . . . may not review a determination of credibility.  It is for the

Secretary and his examiner, as the fact-finders, to pass upon the credibility of the

witnesses and weigh and evaluate their testimony.") (alteration omitted).

Moreover, "Discounting credibility to a certain degree is appropriate where an ALJ

finds contradictions among the medical reports, claimant's testimony, and other

evidence." *Walters v. Comm'r Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997).

        With this in mind, I conclude that the ALJ's RFC assessment is supported by

substantial evidence and the ALJ did not err by discounting Plaintiff's credibility.

After making the foregoing, specific observations about Plaintiff's SLE and DDD

(or back pain), the ALJ explained the reasons for her credibility determination,

and, as follows, Plaintiff's challenges to the ALJ's credibility determination are

unavailing.  Although Plaintiff contends that "[n]o reference is made to any report

of pain by the Plaintiff, to any other symptoms, or to Plaintiff's credibility related

to her cervical condition[,]" (DE 16 at 22-23), this is inaccurate.  In fact, it is clear

the ALJ considered the factors set forth in 20 C.F.R. §§ 404.1529(c), 416.929(c)

for evaluating the intensity and persistence of symptoms, such as pain, including

pain related to her cervical condition:

### i.       General.

The ALJ made a general observation at Step 2, finding that Plaintiff, "as an

individual with obesity, experiences greater pain and functional limitations than

might be expected from her medically determinable impairments individually . . .

."  (R. at 24.)  Thus, the ALJ determined that "the medical signs or laboratory

findings show[ed] that [Plaintiff has] a medically determinable impairment(s) that

could reasonably be expected to produce [her] symptoms, such as pain . . . ."  20

C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).

### ii.      Consideration of objective medical evidence.

The ALJ considered the "objective medical evidence."  For example, the

ALJ stated:  "*Examination findings confirmed resolution* of her symptoms,

specifically, 'coordination normal in all extremities' and 'sensory examination

shows vibration normal in all extremities (7F/1 [R. at 436]).'  A brain MRI had

unremarkable results (8F [R. at 448]).  She had minimal diagnostic and

examination findings for her back pain complaints (8F [R. at 447], 14F/3 [506-

508])."  (R. at 29 (emphases added).)  Also, the ALJ expressly reviewed several

spinal MRI results.  (R. at 28, 394-396, 399-400 [Ex. 3F], 447 [Ex. 8F], 551 [Ex. 17F].)

Plaintiff contends that the ALJ substantially misstated her medical records' contents.  (DE 16 at 18.)  For example, Plaintiff contends that the ALJ "improperly interpreted Plaintiff's treatment records as indicating *improvement or resolution of symptoms*, when in fact the records indicate a *continuation of symptoms*."  (DE 16 at 21 (emphases added).)  Also, Plaintiff argues that the ALJ "significantly misinterpreted the objective medical evidence related to [her] lupus[,]" and "failed to address the significance of the objective medical evidence related to her cervical disc disease."  (DE 16 at 24.)

Specifically, Plaintiff points out that Dr. Beall's May 5, 2011 notes – which, among other things, recognize "dissemination in space criteria for a diagnosis of multiple sclerosis provided CNS lupus is ruled out[,]" and "another attack of recurrent myelopathic quadriparesis . . .[,]" – do not evidence "resolution of symptoms . . . ."  (R. at 436-437, DE 16 at 19-20.)  However, the ALJ's reference to this record both acknowledged the "joint weakness" and repeated Dr. Beall's statements as to extremity coordination and sensory examination.  (R. at 28, 29, 436).  Moreover, even if, as Plaintiff argues, the December 13, 2011 cervical spine MRI, which revealed cervical lordosis straightening, "provided objective medical support for the severity of Plaintiff's symptoms[,]" (DE 16 at 22, R. at 447), Dr.

28

Giancarlo's February 3, 2012 letter - which the ALJ expressly acknowledged – repeated the impressions of that exam, when he stated:  "MRI of the cervical spine was performed indicating a right paracentral disc osteophyte complex effacing the anterior CSF space and causing *minimal deformity* of the cord at C5-C6, *no evidence of abnormal enhancement or enhancing mass lesions* of the cervical cord or cervical vertebral bodies.  Incidental note is made of a hemangioma involving the T1 vertebral body."  (R. at 28, 551 (emphases added); *see also* DE 16 at 29-30 (Summary of Medical Record).)  Acknowledging Dr. Giancarlo's letter, the ALJ restated much of Dr. Giancarlo's review of this test.  (*See* R. at 28, 551.)  Therefore, it cannot be said that the ALJ failed to accurately consider these pieces of objective medical evidence, and it is beyond this Court's standard of review to reweigh this evidence and reach a different conclusion from it.  20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2).

### iii.    *Consideration of other evidence.*

The ALJ considered "other evidence."  For example, the ALJ noted that Plaintiff's "activities of daily living" are "somewhat limited[,] but she acknowledges the ability to do occasional household chores and sufficient concentration to watch television.  [T]he claimant is independent in personal care (5E [R. at 280-287]).  She also testified that she cared for her learning disabled son

29

[*see*, *i.e.*, R. at 75, 86, 93, 94, 95, 96], took college classes [R. at 76-77, 92-93], and

attended her son's sports events [R. at 94]."  (R. at 29.)[10]  Also the ALJ observed:

> The claimant's *treatment* has been *routine and conservative* in
> terms of her physical conditions with *treatment* for her Lupus
> being generally effective as she reported being "significantly
> better" and her report [that] "she feels her lupus is controlled
> (3F/8 [R. at 384], 8F [R. at 446-448])."
> . . .
> Treatment for her headaches also brought symptom relief (l3F/2
> [R. at 492], l7F/3-5 [R. at 547-548]).  . . . She testified that she .
> . . had the ability to take college classes [R. at 76-77, 92] and
> manage finances "on line."  [R. at 97.]

(R. at 29 (emphases added).)[11]

To be sure, Plaintiff points out that Dr. Giancarlo's notes dated December 2,

2011 *more accurately* state that Plaintiff "feels her lupus is controlled on Plaquenil,

but is currently experiencing hair loss as well as fatigue[,]" and experiences

"headaches . . . usually first thing in the morning . . . " and that the impressions

include "[q]uestionable cervical stenosis with notable cervical myositis[,]" and

"[m]igraines with mixed cervicogenic headaches currently controlled."  (R. at 446,

---

[10] These citations call into question whether Plaintiff testified to caring for her son.
However, Plaintiff does not seem to dispute this finding.  (DE 16.)

[11] Plaintiff challenges the ALJ's consideration of the October 10, 2008 letter from
neurologist Steven Beall, M.D. on the basis that it predates the relevant time
period.  (DE 16 at 19, R. at 384.)  I reach the same conclusion here as I do above
with respect to the ALJ's consideration of the January 15, 2008 consultative
examination report (R. at 370-376).

DE 16 at 19, 22.)  Also, Plaintiff argues that Dr. Prakash's March 22, 2013 notes –

which indicate rash, generalized muscle pain, Vicodin and hydroxychloroquine

prescriptions, mild tenderness in the muscles, and an order for a cane (R. at 496-

502) - contradict a conclusion that Plaintiff's symptoms were better or controlled.

(DE 16 at 21.)  Nonetheless, the ALJ appropriately considered Plaintiff's daily

activities and treatment, other than medication, that she has received.  20 C.F.R. §§

404.1529(c)(3)(i)(v), 416.929(c)(3)(i)(v).[12]

> ### iv.    Determination of the extent to which symptoms, such as pain, affect capacity to perform basic work activities.

The ALJ made other express acknowledgments of Plaintiff's pain, and, in so

doing, considered Plaintiff's "capacity to perform basic work activities."  For

example:  **(a)** at Step 3, the ALJ took Plaintiff's chronic pain into consideration

when concluding that Plaintiff had moderate difficulties in social functioning and

moderate difficulties in concentration, persistence or pace (CPP) (R. at 25-26); **(b)**

at Step 4, the ALJ expressly mentioned Plaintiff's claim of "joint pain" in her

function report and her testimony regarding pain in her head, joints and back, as

well as her testimony about shifting when she sits (R. at 27; *see also* R. at 280 [Ex.

5E], R. at 74, 77, 84, 86 [06/09/2013 Testimony]); **(c)** again at Step 4, citing

---

[12] *See also Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("[a]s a matter of law, an ALJ may consider household and social activities in evaluating complaints of disabling pain.").

Plaintiff's certified earnings records, which seem to show earnings in only 14 years of the 28 year period from 1985 through 2012 (*see* R. at 238-240 [Ex. 3D]), the ALJ observed that Plaintiff's "work history is quite limited, which raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments[,]" (R. at 29); and **(d)** at the conclusion of her Step 4 RFC determination, the ALJ noted that Plaintiff's "allegations of disabling symptoms, including use of a cane, and pain were all considered in the most favorable light[,]" (R. at 30). Thus, the ALJ considered the effects of Plaintiff's symptoms upon her ability to perform basic work activities and then fashioned an RFC determination which included the physical exertional limitations of sedentary work (with a cane) and certain postural limitations. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).

### e.    Partial credit to Plaintiff's complaints

Having considered the foregoing factors, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are *not entirely credible* for the reasons explained in this decision." (R. at 27 (emphasis added).) Moreover, as can be seen from the ALJ's assignment of "some weight" to the opinion of state agency medical consultant, Dr. Bankcroft-Treadway, whose opinion was consistent with the exertional limitations of "light work," (R. at 29, 135; *see also* R. at 138), followed by the ALJ's Step 4 RFC determination that Plaintiff's exertional limitations were *further limited* to

32

"sedentary work," (R. at 26-27), the ALJ *partially credited* Plaintiff's assertions about the intensity and persistence of her symptoms, such as pain. 20 C.F.R. §§ 404.1529(c), 416.929(c). Based upon the overall record, the ALJ was well within her discretion to do so, and it is clear to the Undersigned why she did so, her assessment being supported by substantial evidence. The standard of review requires that this assessment be given "great deference," and this is not one of the rare cases in which such a challenge requires reversal or remand. *See Infantado,* 263 F. App'x at 475; *Payne,* 402 F. App'x at 113-114.

## F. Conclusion

I conclude that the ALJ properly evaluated the opinion evidence under 20 C.F.R. §§ 404.1527, 416.927 and SSR 96-2p regarding Plaintiff's mental health limitations. Moreover, I conclude that the ALJ properly assessed Plaintiff's credibility as it relates to her systemic lupus erythematosus (SLE) in accordance with SSR 96-7p[13] and 20 C.F.R. §§ 404.1529, 416.929. Accordingly, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary judgment (DE 16), **GRANT** Defendant's motion for summary judgment (DE 20), and **AFFIRM** the Commissioner of Social Security's decision.

## III. PROCEDURE ON OBJECTIONS

---

[13] SSR 96-7p, effective July 2, 1996, was superseded by SSR 16-3p. (*See* SSR 16-3P (S.S.A. Mar. 16, 2016).

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.

34

Dated: _____

Dated: October 31, 2016          s/Anthony P. Patti_____
                                 Anthony P. Patti
                                 UNITED STATES MAGISTRATE JUDGE


I hereby certify that a copy of the foregoing document was sent to parties of record
on October 31, 2016, electronically and/or by U.S. Mail.

                                 s/Michael Williams_____
                                 Case Manager for the
                                 Honorable Anthony P. Patti